C.B. v. Henry County School District K.B. and S.B. K.B. S.B. v. Henry County School District 24-11410. Please come forward. Mr. Goodmark, I see that you've reserved some time for rebuttal, but you may proceed. Thank you, Judge. May it please the Court, my name is Craig Goodmark, along with Jonathan Zimring and Debbie Haverstick. We represent C.B. and his family in this appeal of an IDEA special education dispute against Henry County School District. C.B. seeks reversal of the decision of an administrative law judge that was affirmed by the district court that failed to apply the appropriate standard for IDEA placement, failed to conduct the appropriate LRE analysis, and relied on inappropriate hearsay, violating the parent's IDEA rights. C.B., as he is known to his friends, is an elementary, or was an elementary school age student, is now in high school, with Down syndrome. He is learning, participating, making friends. He was mastering goals and objectives in his IEP and benefiting from an inclusive environment. The school at the IEP meeting in May 2019 decided that they knew what was best for C.B., and that that would be a more restrictive placement. Despite his admitted progress, admitted by the district in their answer at volume 24-1, page 146, and seen in the record through the district's progress reports at volume 24-9, page 116-17, to address a primary issue, the parents in C.B. absolutely have an LRE right regarding placement, and the ALJ's sua sponte decision that was affirmed by the district court that no claim exists, existed, looked only at the number of non-disabled kids in each program, and this was error. For one, the school admitted that this self-contained placement, there are two placements in this case, Your Honors. There is a resource room and a general ed, a resource room provided through general education, and then a self-contained placement. So we have two competing placements here. Let me make sure I understand. As I understand it, there is a general education, which is about as mainstream as you can get, and then there is a group resource, which, as I understand it, is a small group setting for students with disabilities taught by a special ed teacher being taught general education standards, and he was in a resource class for some subjects, and your objection is the school is now suggesting that he move from the resource class in those subjects, which is already out of the general education mainstream, to a mid-class? Everything except the last thing you said, which is this is still a general education program tied to general education standards, and that's the most important part, I think. He's not being in his resource class. He's being educated only with students with disabilities. Correct, and the environment may be that, and there are varying types of disabilities, but what defines the placement is the fact that it's still tethered to state standards. The curriculum is still an academic curriculum as compared to a self-contained placement, which would be quantifiably different. We have two very different looking images of what school would be. One would be learning multiplication, writing a sentence, comprehension and reading. The other would be functional life skills, riding a bus, telling time, going to McDonald's and getting your order right. Those are two very different programs, and that was what was at issue in this case. Do you concede he cannot be satisfactorily educated in a regular classroom for those subjects that he's in resource for? We would say that he can be educated in the regular education environment using the maximum range. His parents did not object from moving from the general education environment to the resource setting. Resource is a supplementary service that is part of the general education environment. If you look at Greer at 696 and if you look at the statute at 1415B6, excuse me, 1415A5A, you see that the continuum of placement starts with general ed with special education support, but it's still a general education placement. And so, yes, he can be in the general, he can still be learning his multiplication. He may need a calculator for that. He can still be learning to write a paragraph. He may start with a sentence. But absolutely, he can still matriculate through the state standards. And the issue in this case is should he stay matriculating through those state standards or then should he be removed from that and move to a functional environment where he no longer receives that type of instruction? We would say... So I really appreciate that because I did interpret the district court's order to focus only on two categories, kind of the general education population and then the special education population, and that the district court found that because he was already in the special education population, any changes within that curriculum didn't constitute a new placement. Is that an accurate interpretation of the district court's order? Correct. The district court and the ALJ, both the ALJ and Monsua Sponte, identifies these as essentially somehow the same placement. It's special ed here, it's special ed there, so it's special ed. It's more nuanced than that, unfortunately. So that's the nuance that I want to understand. So is it that you're saying that any changes made even within the special education category still trigger the protections that you're trying to advance? We think there is authority for that, but in this case we have a general education environment with resource support. And then when you look at Greer, they identify that. In this case, the 11th Circuit and Greer v. Rome City Schools sets this standard and really explains this case. And we've had kind of this fact pattern repeated in the 3rd Circuit and in the 5th Circuit and in the 6th Circuit where a child with Down syndrome is being moved from the regular education. In this case, it's regular education with a resource room support to a self-contained setting. And so it is two different placements, one regular education with resource support, the other self-contained. And when you look at the curriculums and when you compare the two programs themselves, as Greer requires that we do and that the ALJ and the district court did not, you start to see why it's so important to evaluate this for mainstreaming purposes. Again, one is tethered to state standards. One is measured by standardized assessment with integration with non-disabled kids. The self-contained class is, in this Henry County mild intellectually disabled self-contained class specifically, is completely untethered from the state standard. And while there was some discussion that, oh, we can modify, that's not the evidence that's in this record. Let me ask you a question about Greer and make sure I understand how you're arguing that Greer applies to this case. So Greer says, when education in a regular classroom cannot meet the handicapped child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place this child in regular education. It seems to me, please correct me if I'm wrong, that you are suggesting that the fact that your client was in a resource setting does not in any way suggest that he was no longer being educated in a regular classroom. Essentially, yes. And Greer talks about that and says, in this case, regular education with supplementary aids and services, and that's really another key to this case is that we have supplementary aids and services. And while we may think of them as, well, what could that be? Is it a special desk? In this case, it's the fact that the child is receiving instruction in a resource room or itinerant instruction. And that's expressed in the regulation. It's expressed in the statute. And it's expressed in Greer. They talk about when you're moving from regular education with resource room support or supplementary aids and services, comma, resource room, to a more restrictive setting, then the court must evaluate the benefits of each program. And that didn't happen in this case. When you look at the benefits of each program, you would see, well, first, the court could not do that because that was not the case that was put on. The family presented ample evidence of the appropriateness of the resource classroom. Four experts came to testify on CB's progress in the resource classroom, his ability to maintain his performance, you know, be they modified state standards, but on those state standards. Let me ask you a question about from your briefing. You say he was making progress on his goals, but his goals were first grade, not fourth grade. Correct. And there is no requirement that a student keep up with non-disabled peers. That's essentially what IDEA was created to ensure is that children, even if they're not performing at mastery or on the same level as non-disabled peers, can enjoy the benefits of inclusion. And when you look at Greer, they talk about there are non-academic benefits of inclusion that tip the scale in the favor of keeping a child in regular ed, even if that child is not performing at the level of a non-disabled peer. And in this case, we have ample evidence in the record that this child was receiving those benefits. He was learning. He was participating. He was making friends. He continued to do that, even after the decision. Tanner's was preponderance of the evidence, correct? And so, one, how is it with the evidence? I know some of the evidence you're challenging perhaps Ms. Tanner's comments about CB not doing that well in the classes where he was. So there's one, how do you overcome the fact that there was at least some evidence in the record to support the school's decision when you have a preponderance of the evidence standard? So that's one. And then number two as to evidence is how much discretion should we give to the school officials as experts, arguably, in this kind of setting? I'll answer the second one first. Greer says that when you don't have a robust discussion about these placements at the IEP meeting, when you have what we have in this situation where a school district just simply told the family, we believe this is what is best, and there's a back and forth about what the legal standard is, the school isn't entitled to that much deference there. In fact, when you talk about LRE, there's a case in the Third Circuit called Oberti, which talks about there is no deference in the LRE decision to the school because it's not an academic decision. This is a decision that transcends the bounds of academic, so they don't get that much deference. And with respect to the evidence at the hearing, we would say this is a de novo review. You know, there are many errors of law that happened as well. When you look at, you know, the considerations of the LRE at the IEP table, the court didn't evaluate, and I will finish, I apologize, the court didn't evaluate whether or not there would be harm. The court didn't evaluate what were the benefits. The court didn't evaluate in any real way what was going to happen if CB was going to be moved to a more restrictive setting, and that's error. And in fact, the whole reason is because there was no evidence presented at the hearing about this self-contained placement. They just simply didn't come to court with it. And it was only after the fact that they were able to pull out evidence from Ms. Tanner's testimony or Ms. Tanner's statements at an IEP meeting that were never testimony and never sworn under oath. Okay, there's one sentence that you kind of trailed off on in response, and I would like to hear the end of that sentence. In response to Judge Abudu's question about what deference do we owe the school officials, you said this kind of transcends, and then you didn't finish, transcends. What is being transcended? The academics. This is more than academics, and when you look at Oberti, it talks about whether or not we give deference on an LRE placement, and the court in the Third Circuit says we don't. And we haven't reached that here, but, you know. How does this transcend academics? Because we're talking more, not just about the reading and writing and arithmetic. We're talking about social learning. We're talking about development. We're talking about, you know, the way in which a child can receive the benefit of being included. And so it's not just about is he going to master the state standards, which educators know their state standards. They know the curriculum. It's about more than that. And so the school doesn't get the same deference. But on academics, the school gets deference. Is that what you're conceding about? There is language in the case that I wouldn't concede that, Your Honor. I think it needs to be a collaborative process with robust discussion. That didn't happen in this case. Because I know that the school, and we have information in the record about what the school did in reassessing what sort of plan he needed to be on, and they're talking about meeting with a school psychologist, that he's scoring in a very low percentile on cognitive ability tests. He's scoring in the deficient range on visual motor skills, the deficient range on all portions of the assessment. Academic skills, reading, math, written language. I agree there were some assessments about self-care and life skills, and the teachers provided ratings, and the mother provided ratings. And there's a disconnect between those ratings, fairly dramatically so. Because his mother, understandably, is giving him ratings in the average range, but they are inconsistent with the other observations. For example, one question concerned his ability to tell time using an analog clock, and C.B. apparently is unable to do so. But his mother did not rate him as such. Instead, she said she gave him a score based on his ability to tell time using a digital clock. So I understand here, to get to my question, that the school, you're suggesting that there was no robust conversation. I guess I'm just trying to figure out what more are you saying should have been done? It sounds like a robust conversation to me. I understand why you would say that. These are very complex kind of plans that are getting put together, but at its apex, when it came time to make this decision, I would urge you to go back and look to the record. It's page 48 to 50 of this transcript. And when they say, okay, we need to decide where to put C.B., the school district says, we need to do what's best. We know what's best. A subjective standard that doesn't relate to anything in our regulations or in our statute. And then they go forward and say, this is what we're doing, this is what is best. That is not the collaborative discussion that is contemplated by IDEA procedures. And so that's why Greer says, if you don't come to the meeting and tell us more than just what's best, then you aren't entitled to the deference there. And so that's why we say that, Your Honor. Thank you. And you do have four minutes for rebuttal. Ms. Riddle. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Megan Riddle, and I represent the Henry County Schools, which is a public school system in Henry County, Georgia, serving the students of Henry County, Georgia. Before you get started, can you let me know if you agree with his assessment that we're still treating C.B.'s placement in resource as still part of general education? I do not. It is not a part of general education. I do not agree with that. Judge Abudu asked about the nuance of the continuum of services, so I'd like to give you a little roadmap of those nuances. So there is general education, a general education setting, where students in that setting are going to be working towards the Georgia Standards of Excellence. Within that setting, there are supports and services that might include paraprofessional support, consultative support, and co-teaching by a certified special education teacher. The next step on that continuum is outside of the general education setting, and within that outside the general education setting, there's a continuum there, too. I would say your first stop on that continuum is going to be that resource room. Students within that resource room are going to be— it's only going to be students with disabilities, for one thing. It is a small group setting. And those students with disabilities are working toward the Georgia Standards of Excellence. So they are working on what I would call the general education curriculum. They will have a certified special education teacher in that setting, and they may have a paraprofessional as well, depending—that can vary from district to district. The next portion of that outside the general education setting, but still within that same building, can vary widely from district to district. It could include what we have here, which is the mild intellectual disability setting, or the MID setting. It can include an autism curriculum that might be a general autism curriculum, where students with autism are working on general education standards, but they have a special classroom and a special curriculum that's designed for their needs with autism. There could be an autism-adapted curriculum, which is going to be similar to that MID setting, where in the MID setting, as well as that autism-adapted curriculum, those students are not necessarily working at the pace of their general education peers on the Georgia Standards of Excellence. They have to have exposure to those standards, and they have to be assessed on those standards if their IEP team has determined that they will be assessed through the Georgia Alternate Assessment rather than the Georgia Milestones. They have exposure to them, but they are not necessarily being held— they're not going to be graded on those standards. They aren't necessarily going to meet the standards in the way that their general education peers might meet them. She brought up, in the implementing regulations for IDEA, a description of resource rooms as supplementary services. Wouldn't that make CB's resource room a less restrictive placement than the MID class? I think there's two ways to look at that. Restrictive in that he does not have access to general education peers in that setting. Yes, it is more restrictive in that sense. Is it more restrictive than the MID setting in a sense? Yes. Generally, students who are receiving instruction in the resource room are also receiving instruction in a general education environment. In this example, in fourth grade, CB was receiving instruction in general education in science and social studies. He was receiving instruction in special education in math and ELA, English language arts. In that sense, it is less restrictive than what the MID setting could look like for a particular student. For CB— So that's restrictive in terms of the curriculum, but I thought that this is not just about the curriculum. It's also about the setting and where that curriculum is taking place. It does sound in your description of the continuum that CB is technically being placed in different classrooms. Which, I guess, in some ways might support their argument that this is still about placement. I don't deny that he would leave a general education classroom and go to a separate classroom. Ms. Tanner stated during the meeting that she would have to go get CB from that general education setting and take him to the resource setting. I agree that if placement is a place, and I think we could say that literally it is a place, then he does leave the general education setting and goes to a different place. The same would be the case for the MID setting. It is not going to be a program that's housed within that classroom, that physical classroom with Gen-Ed students. It is going to be a separate classroom. These are all within the same building for this case. Correct. Correct. Correct. Really, the real gripe that the parents have with the move from resource to the MID setting is that changing curriculum. In that resource setting, CB, for math and English language arts, he was not going to be working towards the Georgia Standards of Excellence. He would have exposure to that. He has to have appropriately rigorous exposure to that. But he's not going to be graded on the Georgia Standards of Excellence. He would now be what's called on an adapted curriculum. It's adapted to his needs, appropriately to his needs. The mainstreaming is not just about the curriculum, because even within the general education population, there are differences with the curriculum. Perhaps to their point, there's also the social skills that are being built. There's also the other benefits of being around other kinds of children. From your description, again, it sounds like CB is now being removed from those environments as well that provide those particular benefits. I do want to correct one thing you just said. Within that general education setting, the curriculum is the same for all students who are being graded on that curriculum. For a student like CB, if the IEP that had been proposed had been accepted and we were not litigating it, then CB would have remained in social studies, science, specials, which would be music, art, and then physical education and homeroom. He would have remained with his general education peers, which would have given him that social exposure. So the majority of his day would have been with general education peers. I could be misstating, but I believe, according to his IEP, the MID setting was going to be for 50 minutes for math and 50 minutes for ELA. So the rest of the day, he was going to be with general education peers. If he was only shipped in this new proposed plan, it would not affect that he was in the general education classroom as he has always been. Correct. It only affects the subjects for which he's in a resource setting, and it moves him from resource to MID. Correct, and it's the same subjects. It's just now he's not going to be received. Another part of their complaint is that now that he's in the MID setting, those children are going to have more significant disabilities than the children who are in the resource setting. But arguably, because it is a mild intellectual disability setting, those will be students who are on the same level as CB. They will also have mild cognitive disabilities. I lost my train of thought of a part of your question. So under IDEA, it states that intellectually disabled students should be educated with children who are not disabled to the maximum extent appropriate. So your argument is that's true with the new plan because he stays in general ed for the certain subjects that he's already in general ed for. But can we drill down on your argument as to why moving CB from resource to MID does not run afoul of that provision? Right, so it's about the appropriateness. That's what you're getting to. Okay, and now I remember my train of thought, and this is going to tie into that. So if this plan had been accepted and he would have remained in those general education settings, as I've indicated, however, he would not be held to the Georgia Standards of Excellence in those general education settings because he would then be assessed on the Georgia Alternate Assessment. And so he's not going to be graded with his peers. He will have that exposure. He'll be working toward those standards, toward access to those standards, but not being graded on them. That's the difference in the MID setting is that he is not getting that curriculum. Okay, and then I'm sorry, repeat what your question was. So the IDEA says that intellectually disabled students should be educated with children who are not disabled to the maximum extent appropriate. I see that you're saying for certain subjects he remains in the general education classroom, so no problem with IDEA, but what is your argument that it's still in compliance with that IDEA requirement to move him from resource to MID? I'm assuming that your argument is he's already been removed from the general education classroom. He's in resource, so the school district would say we're satisfying that because moving from resource to MID does not in any way affect this standard. Right, so the presumption is that students should be educated with their general education peers. The presumption was already overcome in this case. Both parties already agreed that for math and English language arts, the general education setting was not appropriate for him, that he could not be satisfactorily educated in the general education setting in those two subject matter areas. And so that presumption was already overcome in this case. So this provision no longer has application in the move from resource to MID, or is that just policy? Correct. No, I think that is absolutely correct. And I think what appellants are arguing is that that undercuts their ability to challenge the removal. I disagree with that. They still have the ability to challenge the removal as a denial of a free and appropriate public education. They can still say that even within the special education programs, this program is not the appropriate one for this student. They could have challenged. From the move from resource to MID, it's not just this challenge? Correct. I would say yes, this is the incorrect challenge for that placement. I also want to say that although both the district court and the ALJ determined that the Greer analysis did not apply here because this wasn't appropriate as a least restrictive environment challenge, both courts nonetheless did the analysis under Greer to determine that the decision was appropriate. I also want to point out the conclusion in Greer, because what appellants have brought before you today is really a challenge to methodology. That they disagree with the educational methodology because they do not think that the curriculum that will be offered in the MID setting is the appropriate curriculum for CB. However, in Greer, the court was careful to say that, to note that they were not trying to tell the district where it needed to educate the student, only that it had to follow the mandates under the IDEA, and that's what the ALJ and the district court did here. They analyzed whether the district had followed the mandates under IDEA and found that it had, and therefore there was no further analysis to be had. I have two more minutes, but I do not have any, well, I can argue the GAA. There is one thing that I wanted to point. Yes. And I think this would echo Greer, and I think it echoes what you're saying, but just to make sure I understand, is that because, as you say, the plaintiffs are challenging the methodology, you're now inviting the court into what a decision that more appropriately lies with the district. I would disagree that I'm making that invitation. I would say that Greer leaves that door closed to the court. That Greer says that's not our job. That's not our job. Yes. The plaintiffs have asked us to do something that we should not be doing. That is what I am saying, Your Honor. Yes. I did want to speak briefly in the time that I have to the appellant's argument about the Georgia alternate assessment. So you're opening the door. You can say she's changing her mind, but it will open the door for them on rebuttal. I want to point to one thing in the record that I think is important. In the Henry County Schools handbook, there is a page that is in the record that shows you that this is doubly moot at this point, because he's entered high school. He had to have taken this assessment in middle school in order to be eligible for the alternate diploma in high school. And so it's not something that evades review. He's not eligible any longer. And that is on DOC 18-10 at page 166. So explain that doubly moot point. So the Georgia alternate assessment is in lieu of the assessment for special education students instead of taking the Georgia milestones assessment. And the school district wanted him to be assessed on that. Correct. And all students have to be assessed. That's Georgia law. They all have to be assessed, one or the other. The parents objected. They wanted him assessed by Georgia milestones. Georgia milestones is a requirement in order to receive a high school diploma. The GAA, you have to take that assessment in order to receive that alternate diploma. Because he did not take the GAA in middle school, and he had not taken it before he entered ninth grade, he's not eligible for GAA now. So it really is a truly moot issue at this point. I thought it was moot before. I will say that. So it's on DOC 18-10 at 166. It is a page in the Henry County Schools Handbook, which gives you the graduation requirements. Thank you for your time, Your Honors. Thank you. Thank you, Your Honor. That's not part of this record, and the answer is no. I understand. That's their handbook. That's not the State Board rules, right? And so whether or not their handbook was in compliance with State Board rules, it was already out of compliance at one point. And so I can't opine or I can't give you an argument on that. But I can tell you that in Rowley and in Hoenig That certainly would be welcome to do, Your Honor. But I would say that this case can be decided on the issue of whether or not it was an appropriate placement, as you recognize. We do have many ways to roam here. I do believe we have an LRE claim. I don't believe that the court have properly evaluated it under Greer. We will brief it, Your Honor. Thank you. I will say that your discussion about moving from resource room to MID was you finally honed in on what was going on. This is the dispute. It's only two classes. The rest of this is really a red herring. And if you look at these two classes and you look at Greer and the statute and the LRE regulation, it would tell you that this resource room is a supplementary aid and service. And the reason that's important is because you have to go through the two steps of the LRE process. One, can the child be educated in the regular ed? And if not, has the child been mainstreamed to the maximum extent appropriate using supplementary aids and services? Resource room expressly in the regulation is a supplementary aid and service. And so that's why there is a claim here under the LRE rule. And when you look at the amici brief, page 17 and 18 that was filed, when you are changing these programs, there's been a circuit that has held, it's ND versus Hawaii, that when you change the program, you're changing the placement. And so this analysis, this you're already in special ed so you don't have an LRE challenge, would eliminate the types of LRE challenges that would exist for any kid that's not in general ed. And so if I'm in the self-contained MID class and the school wants to move me to a hospital or to my home, that analysis prevents a claim. And that simply, it doesn't comport with LRE, IDEA, or even the other parts of the statute. And counsel correctly identified we could, we do have the right to raise all disputes under 1415b6. And when you look at the United States Supreme Court case in Winkleman, it says that because this statute is so complex and so robust, or I should say so dense, you have to consider the entire statutory scheme. And if you interpret the LRE rule in a way which eliminates a placement challenge for kids that are already in special ed, you're not doing that. You're arguing out or you're reading out 1415b6, which gives parents the right to dispute placement. And under the placement definition, it talks about in compliance with the LRE rules. I would also say you are correct, and counsel's correct, there is another path to victory for the family here, and that is that Andrew F., which is the Supreme Court case from 2017, expressly tells schools that they must make IEPs that are not just appropriate, provide meaningful benefit for children in light of their circumstances. That's one element of it. But they also have to be ambitious and challenging. And that's right from the case. It's expressed from Andrew F. And if you look at these two IEPs, working on the state standards, learning to do math, learning to write sentences and then paragraphs and then essays, or riding a bus, telling time and ordering McDonald's, that is not challenging or ambitious. And that is a requirement that school districts have to meet. We would ask, after six years of litigation, that this Court reverse the district court holding that no LRE issue was triggered by the move and that they declare that FAPE and the LRE was the regular class for math and English with resource support. As that was the case that we proved at the hearing, that was the case that was before the district court, and CB continues to make progress in that environment to this day. Thank you. Thank you. Thank you. Thank you.  That is the end of our case under advisement.